No. 16,774.

DEINES BROTHERS, INC. ET AL. *v.* INDUSTRIAL
COMMISSION ET AL.

(242 P. [2d] 600)

Decided March 10, 1952.

Mr. DUANE O. LITTELL, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAW-
RENCE HINKLEY, Deputy, Mr. PETER L. DYE, Assistant,
for defendant in error Industrial Commission.

*En Banc.*

MR. CHIEF JUSTICE JACKSON delivered the opinion of
the court.

THIS is an industrial commission case. It commenced when William F. Hancock, to whom we hereinafter refer as claimant, filed his workmen's notice and claim for compensation because of injury to his right eye. He described himself as truck driver for his employer, Deines Brothers, Inc., of Loveland, dealers in lumber and building materials, and stated that on Saturday, July 2, 1949, he first noticed his eye was bothering him while eating lunch at his home. Upon his return to work, he made a delivery "and then started to put an end in a floorless building" at the lumber yard; but his eye began watering and hurting, "So I finally had to come home and then later the same day saw a doctor. I had cleaned rubbish and old forms out of the building during the forenoon." He reported his condition to the son of the president of the company on that afternoon. He was able to return to work August 15th.

His explanation to the referee of the commission as to how the injury might have happened reads, that he "was putting up the end of a building, putting two by fours for nailing boards on and the wind was blowing from the south and it must have blown a sliver off the board into my eye." He quit work about three o'clock in the afternoon, and went to Dr. Tretheway, in Loveland, a little after four o'clock. He was under Dr. Tretheway's care for about a week. He further testified that as a result of this injury to his eye, he has only partial vision at the present time. In answer to the question, "How much can you see with it?" he said, "Just light." He was eating lunch at home when he first noticed his eye bothering him, but he did not know when he got that something in his eye.

January 20, 1950, after the hearing, the referee denied the claim, "for the reason that the claimant failed to establish that his injury and subsequent eye condition resulted from an accident arising out of and in the course of his employment."

Claimant then filed his petition to review the referee's

unfavorable ruling. As a result, the Industrial Commission granted a further hearing "to permit the parties to introduce further testimony."

At this hearing claimant, unmarried, in addition to testifying concerning the circumstances of the accident, as set forth in the previous hearing, testified that he had not worked the previous day, Friday, but "had driven to Denver and back;" that while in Denver he had spent his time in the State Museum. He further testified that he had worked for his employer on the preceding Wednesday and Thursday; that the work he had been doing for his employer was mostly clean-up, off and on pounding nails with a hammer; that he did not go to the saws. Once or twice a day he held the lumber while Mr. Deines ripped it, taking it away from the saw as he ripped it, but does not remember whether he did any of that on Thursday. He was not working with heavy lumber or big nails, but just clean-up lumber. He also testified that he had not been doing anything of an active or violent nature, where he might have gotten anything into his eye, except his work; that his home is the first house west of the lumber yard; that he had done nothing around his home before he had his lunch; that he did no work around his home with a hammer or tools all that week; that he worked eight hours a day at the lumber yard and did not work any other place; that most of his work consisted of driving a truck. He went to Denver in his own car, and stated that he did not have the windows open; that he did not stop and do anything with his car on his trip to Denver; that he had no reason to rub his eyes; never did rub his eyes with his hands, but he had done so with his handkerchief, and did so on Saturday, July 2, 1949, when he first felt something in his eye. He further testified that he did not touch his eyes with his sleeve or arm for two or three days before he noticed this trouble in his eye; that he has no grass or bushes around his home; works a little around the house; but did not at the time of the trouble with his eye. His

house is gas heated—just a stove. No basement in his house. "Q. Do you own your own automobile. A. Yes sir. Q. Do you do any work on it yourself? A. It ain't worth it." He stated that he stays at home at night.

Henry A. Deines testified that claimant was a general helper around the lumber yard, keeping up the premises in his spare time when he wasn't delivering lumber; that July 2, 1949, he made some deliveries, and when he caught up with them he was put to work closing in the end of the building; that he did not work the previous Saturday, but did work on the previous Wednesday and Thursday; that his work on Wednesday was just regular routine. Deines also testified he first heard about the injury sometime in the afternoon of July 2.

Dr. Tretheway testified that he was a graduate of the Kirksville College of Osteopathy and Surgery, and duly licensed to practice osteopathy and surgery in Colorado; that he had examined Mr. Hancock on July 2; that he "had a foreign body lodged in the cornea of the right eye, almost centrally located, so near the center that we can call it centrally located, at least, a small amount toward the upper outer corner of the cornea;" that there was some destruction of tissue around the foreign body at the time; that under a local anesthetic he used an instrument to remove the foreign body. It was through the first three layers of the cornea of the eye. The thickness of the cornea is a little less than an eighth of an inch. "In Mr. Hancock's case this foreign body had pierced the outer three layers of the cornea which includes the very sensitive and thin epithelial layer, through the tough fibrotic second layer and into what they call the substantia propria. * * * There are five layers in all. * * * the foreign body definitely was in this central, thick layer * * * probably two millimeters in depth." He further testified that to penetrate in that way it would have been necessary that the foreign body be driven in with force, that it could not be introduced

by a casual rubbing of the eye or the wind blowing it in; that there was infection and its presence indicated that probably the lesion had occurred to the cornea three days before. "Usually these men come in on the third day, when the infection starts, at least." He added that it would have been possible for the foreign matter to have been imbedded in the cornea without Hancock's knowledge; that it doesn't necessarily cause irritation to the eyelids; that is the time that the eye starts to get red and hurt them and really bother them; that he is not a specialist in the treatment of eyes, although he does a great deal of eye, nose and throat work. He further stated that he had been doing eye work for five years. In answer to the question as to when the foreign body entered the eye, he stated that he had no way of knowing positively when anything hits anyone in the eye. In answer to the referee's question as to how large this foreign body was, he said it was very small. "Q. Were you able to determine what type of foreign body it was? A. I thought it was a piece of wood, but I wasn't sure. It wasn't a hot piece of metal, as I so customarily see in my practice, like a sliver off a welding machine or a grinder. Those usually stick in the outer epithelial layer, but in this case that wasn't the case. It might have been a piece of wood."

Following this second hearing, the referee entered his supplemental order dated July 25, 1950, which included the following: "That the claimant sustained an accident arising out of and in the course of his employment July 2, 1949, and left work upon that date. Temporary total disability terminated August 15, 1949. Claimant has sustained a considerable loss of vision which cannot be accurately determined until he has been finally examined by competent ophthalmologists. His average weekly wage was $36.00. * * *" Then followed orders, (1) granting $18.00 per week from July 3, 1949 to August 14, 1949, for temporary total disability; (2) setting for further hearing to determine permanent disability; and

(3) that employer pay necessary medical, surgical and hospital expense incurred, not to exceed $1,000.00.

The employer and its insurer then sought a review, following which, under date of August 14, 1950, the Industrial Commission entered its findings of fact and award, which included the following paragraph:

"That the claimant sustained an accident arising out of and within the course of his employment July 2, 1949, and left work upon that date. Although claimant cannot state the exact instant at which the foreign object became embedded in his eyeball the weight of the testimony clearly points to the fact that the foreign body did enter his eyeball while he was working.

"Temporary total disability terminated August 15, 1949. Claimant has sustained a loss of vision which cannot be accurately determined until he has been examined by a competent ophthalmologist."

The Commission subsequently denied a petition for review, and in due course insurer and employer instituted their action in the district court where, after trial, the latter entered judgment sustaining the award of the Commission.

The insurer and employer present the following specification of points: 1. There was no evidence showing, "A. * * * that the claimant sustained an accident arising out of and in the course of his employment * * *; B. * * * any injury proximately caused by an accident arising out of and in the course of his employment * * * " to satisfy the statute. '35 C.S.A., chapter 97, section 294 (b) (c). "2. The findings of fact by the Commission do not support the order or award * * *."

In defense of the actions of the Commission and the district court, counsel for the Commission and claimant cite many cases, although admitting inability to find any case that goes as far as their contentions here. Possibly the most apt of such citations is *Southern Colorado Power Company v. Industrial Commission,* 118 Colo. 186, 193 P. (2d) 885. There, as in this case, indefiniteness

existed as to the exact time when, and place where, the accident occurred. There, claimant was the widow of decedent whose death had been caused by Rocky Mountain spotted fever. From the evidence it appeared definitely that this disease could not be contracted other than by a tick-bite, and that decedent had worked during the entire incubation period of the disease in an area where ticks were prevalent; that during that period, and for more than a week before his illness, decedent had not been in a tick area, except while working for his employer. We held in that case that the time, place and cause of injury were sufficiently established, and that the accident was compensable under the Workmen's Compensation Act.

The seeming similarity of the Southern Colorado Power Company case to the present one disappears when it is observed that in that case the locality where decedent acquired a tick-bite was definitely limited by the evidence to the place where he had been employed, and the onset of the Rocky Mountain spotted fever, from which he died, was within the normal period of incubation after exposure. In the instant case there appears no evidence similarly limiting the happening of this accident to an occurrence during the hours of employment, nor to the usual places of employment. Here, the question is not whether claimant sustained an accident—for that is admitted—but whether his accident and injury arose out of and in the course of his employment.

 It will be noted that in the first hearing before the referee, when the claim was denied, the only testimony was that of claimant, and he could not state how, when or where the injury occurred, nor the nature of the particle that had lodged in his eye. In the second hearing claimant repeated his story given in the first hearing. The new testimony was that of Dr. Tretheway, who stated that the foreign particle had probably been in the eye for three days "and that it might have been a piece of wood." Claimant then testified where he had

been and what he had been doing in the three days prior to the lunch hour Saturday, when he first felt something in his eye. The referee, apparently ignoring this new evidence, found that "the claimant sustained an accident arising out of and in the course of his employment July 2, 1949." There was no evidence to support this finding that was not before the referee at the first hearing, when the claim was disallowed. A review of the evidence still leaves as a matter of speculation the nature of the particle in the eye, and the time, place and manner in which it got into the eye. No incident described in the testimony fulfills Dr. Tretheway's diagnosis that the particle must have entered the eyeball with great force. This action almost would seem to illustrate the case of a presumption based upon a presumption; the first being that the particle in the eye was wood, the second that the small particle being of wood must have gotten into the eye during the period of employment. In other workmen's compensation cases in this jurisdiction both the time and place of the accident have been established, or at least one or the other of those factors has been fixed, so that there has been evidence to show that the accident arose out of and in the course of the employment wherever an award has been granted. Here, there can be only inference; but where the burden of proof is on the claimant, as required by our statute, *Peer v. Industrial Commission*, 94 Colo. 227, 29 P. (2d) 636, mere inferences will not suffice. *United States Fidelity & Guaranty Co. v. Industrial Commission*, 122 Colo. 31, 219 P. (2d) 315, and cases therein cited.

■■ One may speculate that because claimant, during working hours, was employed eight hours out of every twenty-four hours, that the chances were two to one that the foreign particle got into the eye during the time of unemployment. Another inference might be that the chances were more than even that the foreign particle got into the eye during the period when claimant was stirring around during the hours of his employ-

ment. A third possibility might be that he had gotten the particle in his eye while rubbing it during hours of sleep, while he was unconscious. If we accept the doctor's diagnosis, that the particle must have been imbedded with some force, is there an inference that it could have been a small cinder while auto-driving at sixty miles per hour, or a flying portion of the head of a match after being struck, or grit embedded by rubbing the eye with a gloved hand, or a particle left in the eye after walking against a branch or piece of shrubbery? It seems to us that the evidence in this case relates solely to possibilities or probabilities, and when the Commission said that, "the weight of the testimony clearly points to the fact that the foreign body did enter the eyeball while he was working," it was considering mere possibilities. Certainly there does not appear to be any direct testimony to that effect. We have held that inferences drawn from the facts are not binding on this court. *Whitney v. Mountain States Motor Co.,* 106 Colo. 184, 102 P. (2d) 743. And that where there is no conflict in the testimony, we may properly draw our own conclusions therefrom. *Arvas v. McNeil Coal Corp.,* 119 Colo. 289, 203 P. (2d) 906; *Industrial Commission v. Betz,* 111 Colo. 401, 142 P. (2d) 389. More recently we have held that, "Where there is no conflict in the testimony and it appears that an award of the Industrial Commission is based on unwarranted inferences or improper application of the law, the district court is at liberty to set aside the award." *Meyer v. Lakewood Country Club,* 122 Colo. 110, 220 P. (2d) 371.

The judgment of the trial court is reversed, and the cause remanded with directions to order the Industrial Commission to set aside its award.